Alexandre A. Montagu (AM-6989)
Kenneth E. Aldous, Of Counsel (KA-9526)
**MONTAGULAW, P.C.**
1120 Avenue of the Americas, 4th Floor
New York, New York 10036
(212) 996-1287 (tel)
(212) 996-9579 (fax)
alex@montagulaw.com
ken@montagulaw.com

*Attorneys for Plaintiffs Standard & Poor's
Financial Services LLC, and S&P Opco, LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STANDARD & POOR'S FINANCIAL SERVICES LLC, and S&P OPCO, LLC, <br><br> Plaintiffs, <br><br> - against - <br><br> FINVEX SA, <br><br> Defendant. | Case No.: <br><br> ECF Case <br><br> **COMPLAINT** <br><br> (JURY TRIAL DEMANDED) <br><br> (REQUEST FOR INJUNCTIVE RELIEF) |

Plaintiffs STANDARD & POOR'S FINANCIAL SERVICES LLC ("SPFS"), and S&P OPCO, LLC ("SPO") (together with SPFS, "S&P or "Plaintiffs"), as and for their Complaint against Defendant FINVEX SA ("Finvex" or "Defendant"), allege as follows:

**NATURE OF THE ACTION**

1. This is an action to recover an amount not less than $979,535.34 owed by Finvex to S&P under a Master Subscription Agreement, effective as of December 15, 2013 (the "MSA"), a Master Custom Index Agreement, effective as of September 12, 2013 (the "MCA"), and various other Attachments and Schedules related to the MSA and/or MCA (collectively, the "Agreements"). Because S&P has performed fully under those Agreements, S&P is entitled to a

damages award recognizing that, to date, Finvex has failed and refused to uphold its end of the parties' bargain.

2. For the same reason, this also is an action for equitable relief: (i) permanently enjoining Finvex from using indices, underlying data, and services S&P provided to Finvex under the Agreements; (ii) permanently enjoining Finvex from using or referring to S&P's trade names, trademarks, and service marks; and (iii) directing Finvex (a) to expunge S&P's indices, underlying data, services, trade names, trademarks, and service marks, together with any portion or copies thereof, from all of Finvex's electronic systems, and (b) to certify, in writing, that Finvex has completed such expungement.

## THE PARTIES

3. Plaintiff STANDARD & POOR'S FINANCIAL SERVICES LLC is a Delaware limited liability company, with its corporate headquarters located at 55 Water Street, New York, New York 10041. SPFS is a corporate affiliate of SPO and is authorized to do business in the State of New York.

4. Plaintiff S&P OPCO, LLC is a Delaware limited liability company, with its corporate headquarters located at 55 Water Street, New York, New York 10041. SPO is a corporate affiliate of SPFS and is authorized to do business in the State of New York.

5. Defendant FINVEX SA is a Belgian public limited company, with its statutory seat/registered office located at 11 Rue des Colonies, B-1000 Brussels, Belgium, registered in the Belgian Crossroads Bank of Companies with the number 0823.188.718. Upon information and belief, in or about February 2016, the Horus consultancy group, including Horus Europe Holdings Ltd., acquired Finvex Group SA, after which time Finvex Group SA changed its name to Finvex.

**JURISDICTION AND VENUE**

6. This Court has subject-matter jurisdiction over these claims pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and because the dispute is between a citizen of a state and a subject of a foreign state.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Finvex is subject to personal jurisdiction in this District based upon: (i) Finvex's consent to the exclusive jurisdiction of the state and federal courts sitting in New York, New York for the resolution of any dispute arising from or related to the Agreements that form the legal bases for the claims asserted in this action; and (ii) Finvex's substantial and regular business activities in this District.

**FACTUAL BACKGROUND**

8. S&P develops and publishes financial indices, data, information, and software. More specifically, S&P is a global leader in providing and licensing investable and benchmark indices to the financial markets, indices that S&P has developed and maintained – in some instances, over the course of many decades – at considerable expense and effort.

9. A market index follows a certain market and reflects an average of the stock-market value of certain defined shares of stock, providing investors with a useful summary of a particular market's "ups and downs." It enables the world's institutional and retail investors to track the performance of publicly traded stocks within a market (or market sector) without having to aggregate the underlying components.

10. Commencing in the third quarter of 2013, S&P provided calculation services for Finvex's custom indices and licensed certain S&P indices to Finvex, including some of S&P's Sustainability Indices.[1] S&P granted Finvex a license to use certain S&P marks in Finvex's

---

[1] In 1999, Dow Jones – later acquired by S&P – launched its family of Dow Jones Sustainability Indices to track the performance of worldwide companies that meet certain

3

marketing and promotional efforts in relation to Finvex's custom indices and financial products. In addition, S&P provided Finvex with data-subscription services (*i.e.*, access to the underlying sustainability index data). In turn, an investment bank issued financial products linked to the Finvex custom indices.

11. For these purposes, on various dates between approximately October 2013 and June 2017, S&P and Finvex entered into a series of Agreements, pursuant to which S&P agreed to provide Finvex with, among other things: (i) certain custom index-calculation services and index data subscription services; and (ii) licenses to use and/or refer to S&P's and/or its affiliates' trade names, trademarks, or service marks in connection with the marketing and promotion of custom indices and financial products linked thereto. In return, Finvex agreed to provide S&P with, among other things, payment, pursuant to certain Agreements and pricing schedules.

12. Despite S&P's full performance of its obligations under the Agreements, Finvex has failed and refused to comply with its contractual obligations, including its obligation to pay S&P's invoices.

13. As a result, S&P formally terminated the Agreements and now seeks to recover the monies owed to S&P by Finvex under those Agreements and, among other things, to enjoin Finvex from using or referring to: (i) the indices, underlying data, and services S&P provided to Finvex under the Agreements; and (ii) S&P's intellectual property (*i.e.*, its trade names, trademarks, or service marks).

---

sustainability criteria. S&P owns and calculates these Indices.

**The Master Subscription Agreement (MSA)**

14. On or about October 28, 2013, SPFS and Finvex entered into the Master Subscription Agreement ("MSA"), effective as of December 15, 2013.[2]

15. Pursuant to the MSA, SPFS granted to Finvex, among other things:

> [A] non-exclusive, non-transferable, limited license to permit Authorized Users . . . to access and use internally the information products, service and software . . . identified in the applicable Services Attachment(s) and the accompanying Pricing Schedule(s) attached hereto.

(MSA at § 1.1.)

16. With respect to possible termination of the MCA, SPFS and Finvex agreed, among other things, that:

> In the event of any breach of any material term or provision by either party of any Services Attachment, the other party may terminate the applicable Services Attachment by given thirty (30) days' prior written notice thereof, provided however, that such termination shall not take effect if the party in breach cures or corrects the breach within such notice period. In the event of a breach of any material term or provision of this Agreement on the part of [Finvex], S&P shall have the right to terminate this Agreement in its entirety.

(MSA at § 3.2);

> Upon any termination of any Services Attachment by either party, [Finvex] shall (i) cease all use of the applicable Services provided under that Services Attachment, and (ii) expunge the relevant Services and any portion or copies thereof from all of [Finvex's] electronic systems. At S&P's request, [Finvex] shall certify to S&P in writing that [Finvex] has fully complied with this requirement

(MSA at § 3.5); and

---

[2] On or about October 28, 2013, SPO and Finvex entered into an Index Data Services Attachment to the MSA, commencing as of December 15, 2013 (the "IDSA"). Thereafter, on or about May 7, 2015, pursuant to the IDSA, SPO and Finvex entered into two (2) Index Data Pricing Schedules, each commencing as of April 1, 2015 (the "Pricing Schedules").

5

> Upon any termination of all Services Attachments, this Agreement shall automatically terminate

(MSA at § 3.6).

17. The MSA is governed by New York law and, under it, both SPFS and Finvex "irrevocably consent to the exclusive jurisdiction of any courts located in the State of New York." (MSA at § 11.1.)

**The Master Custom Index Agreement (MCA)**

18. On or about December 2, 2013, SPO and Finvex entered into the Master Custom Index Agreement ("MCA"), effective as of September 12, 2013 (the "MCA").

19. Pursuant to the MCA, SPO agreed, among other things, "to calculate and maintain the Custom Indices and disseminate to [Finvex] the values of each Custom Index as described in the applicable Order Schedule (the 'Custom Index Values')." (MCA at § 1.)

20. With respect to possible termination of the MCA, SPO and Finvex agreed, among other things, that:

> In the event of any material breach by either party, the other party may terminate this Agreement by given thirty (30) days prior written notice thereof to the breaching party, which notice shall specify the nature of the breach; provided, however that such termination shall not take effect if the breaching party cures or corrects the breach within such notice period

(MCA at § 5(b));

> Upon any termination of this Agreement, S&P shall immediately discontinue performing all maintenance calculation and other responsibilities hereunder

(MCA at § 5I); and

> Upon any termination of this Agreement, [Finvex] shall cease any and all uses of the Custom Indices and Underlying Data and shall delete, remove or otherwise purge the Custom Indices and all Underlying Data, including any copies thereof, from all of [Finvex's] electronic distribution systems and, upon request, certify to S&P in writing that it has done so

(MCA at § 5(f)).

21. The MCA is governed by New York law and, under it, Finvex "agrees to the exclusive jurisdiction of the state and federal courts sitting in the State of New York." (MCA at § 11(i).)

**The Custom Order Index Schedules,**
**Entered Into Pursuant to the MCA**

22. Between approximately July 2014 and June 2017, pursuant to the MCA, SPO and Finvex entered into a series of Custom Index Order Schedules (Nos. 1 through 12) (the "Custom Order Schedules"), as follows:

      a. On or about July 23, 2014, pursuant to the MCA, SPO and Finvex entered into a Second Amended & Restated Custom Index Order Schedule Number 1 (*Custom Hybrid Indices*), commencing as of June 30, 2014 (the "CIOS1");[3]

      b. On or about July 23, 2014, pursuant to the MCA, SPO and Finvex entered into a Custom Index Order Schedule Number 2 (*White Label Indices*), commencing as of July 7, 2014

      c. On or about April 16, 2015, pursuant to the MCA, SPO and Finvex entered into a Custom Index Order Schedule Number 3 (*Finvex Sector Efficient Europe 30 Index*) (*LICENSEE IP*), commencing as of April 20, 2015;

      d. On or about April 21, 2015, pursuant to the MCA, SPO and Finvex entered into a Custom Index Order Schedule Number 4 (*The Finvex Shariah Efficient Europe 20 Index*) (*Custom Hybrid Index*), commencing as of May 4, 2015;

      e. On or about April 21, 2015, pursuant to the MCA, SPO and Finvex entered into a Custom Index Order Schedule Number 5 (*The Finvex Shariah Efficient Global 50 Index*) (*Custom Hybrid Index*), commencing as of May 4, 2015;

      f. On or about December 3, 2015, pursuant to the MCA, SPO and Finvex entered into a Custom Index Order Schedule

---

[3] On or about March 17, 2015, pursuant to the CIOS1, SPO and Finvex entered into Amendment Number 1, effective as of February 6, 2015.

7

        Number 6 (*The Ecofi ISR 33 Index*) (*LICENSEE IP*), commencing as of November 1, 2015;

    g.    On or about January 12, 2016, pursuant to the MCA, SPO and Finvex entered into a Custom Index Order Schedule Number 7 (*The Finvex Shariah & Sustainable Europe 20 Index*) (*Custom Hybrid Index*), commencing as of January 25, 2016;

    h.    On or about February 12, 2016, pursuant to the MCA, SPO and Finvex entered into a Custom Index Order Schedule Number 8 (*DS Valeur ISR Index (EUR-Net Total Return*) (*Custom Hybrid Index*), commencing as of March 1, 2016;

    i.    On or about May 31, 2016, pursuant to the MCA, SPO and Finvex entered into a Custom Index Order Schedule Number 9 (*The Finvex Ethical Sector Efficient Europe 30 Index*) (*LICENSEE IP*), commencing as of June 6, 2016;[4]

    j.    On or about April 24, 2017, pursuant to the MCA, SPO and Finvex entered into a Custom Index Order Schedule Number 10 (*The Finvex Quality Efficient Asia Index (Net Return and Price Return)*) (*Custom Hybrid Index*), commencing as of April 10, 2017;

    k.    On or about April 10, 2017, pursuant to the MCA, SPO and Finvex entered into a Custom Index Order Schedule Number 11 (*Finvex Sustainable Efficient Japan Index*) (*LICENSEE IP*), commencing as of April 10, 2017; and

    l.    On or about June 14, 2017, pursuant to the MCA, SPO and Finvex entered into a Custom Index Order Schedule Number 12 (*The Finvex Low Carbon Europe 50 Index*) (*Custom Hybrid Index*), commencing as of July 3, 2017.

23.    Each of the Custom Order Schedules provided, among other things:

    a.    Finvex with the right to use each custom index in connection with the creation, structuring, development, managing, trading, marketing and/or promotion of any financial instrument or other investment product that is based on, or seeks to match the performance of the custom index or any portion thereof

---

[4] On or about March 6, 2018, S&P received a letter from Finvex in which Finvex requested cancellation of Custom Index Order Schedule Number 9, as of June 6, 2018. As a result, S&P cancelled that index, as of that date.

(*see*, *e.g.*, CIOS1, Exh. B at § 2);

  b. Finvex with a non-exclusive, limited, and non-transferable license to use and refer to certain of S&P's and/or its affiliates' trade names, trademarks and/or services

(*see*, *e.g.*, CIOS1, Exh. B at § 5.1);

  c. That "[u]pon any termination of this Order Schedule or the rights to use the Marks, [Finvex] shall cease all use of the Marks. At S&P's request, [Finvex] shall certify to S&P in writing that [Finvex] has fully complied with this requirement"

(*e.g.*, CIOS1, Exh. B at § 5.7.3); and

  d. That "[Finvex] shall report to S&P the following details related to each Product annually in arrears . . . : (i) type of Product(s) issued/traded per classifications on <u>Exhibit B</u> (e.g. swap, ETF, ETN, etc.); (ii) normal or principal valued as of the issue date / average daily assets under management (as applicable); (iii) term to maturity; (iv) trade/issuance date(s); and (v) any other information S&P reasonably requires. [Finvex] shall submit all reports outlined in this Section to S&P in the same manner as Informational Materials as described in Section 6 of this Agreement and Section 10 hereof

(*e.g.*, CIOS1, Exh. C at § 3).

**Finvex's Material Breaches
and S&P's Termination Notice**

  24. In mid-January 2019, S&P emailed Finvex regarding its then-outstanding invoices. In response, Finvex stated "[w]e have started the payment, will send you tomorrow all swifts details." Finvex, however, failed to do so and, when S&P revisited the issue, Finvex further stated "[w]e already sent you payment details." Despite multiple follow-up emails, however, Finvex failed to make payment. Upon information and belief, in an effort to avoid or postpone its payment obligations, Finvex provided S&P with inaccurate information.

  25. In or about April 2019, S&P offered that Finvex pay its then-outstanding invoices in three (3) installment payments. But Finvex again failed to do so.

9

26. Accordingly, in a letter, dated June 26, 2019, S&P detailed Finvex's material breaches of the Custom Order Schedules (for non-payment and failure to report products) and the Pricing Schedules (for non-payment). In its letter, S&P also provided Finvex with: (i) formal notice of termination of the Custom Order Schedules and Pricing Schedules, pursuant to Section 5(b) of the MCA and Section 3.2 of the MSA; and (ii) an opportunity to cure its material breaches of the MCA, MSA, Customer Order Schedules, Pricing Schedules, and related contractual materials.

27. Thereafter, in a letter, dated July 18, 2019, at Finvex's express request, S&P provided Finvex with an additional opportunity to cure Finvex's material breaches (*e.g.*, pay the outstanding invoices). But yet again, Finvex failed to do so.

28. In a letter, dated October 31, 2019, S&P finally provided Finvex with formal notice of termination of the Custom Order and Pricing Schedules, pursuant to Section 5(b) of the MCA and Section 3.2 of the MSA. S&P noted that, if Finvex did not cure its material breaches by November 29, 2019, the Custom Order and Pricing Schedules would terminate.

29. With Finvex having failed, on multiple occasions, to cure its material breaches, the Custom Order and Pricing Schedules terminated on November 29, 2019. Upon information and belief, despite such termination, Finvex continued – and is continuing – to use S&P's indices, underlying data, services, trade names, trademarks, and/or service marks.

**Invoices Remaining Unpaid by Finvex**

30. As averred to above, from approximately January 2017 through June 2019, S&P issued various invoices to Finvex – under the MSA, MCA, and related Attachments and Schedules, including but not limited to Custom Order and Pricing Schedules – related to S&P's calculation and maintenance of certain indices and products linked to those indices. Each of the invoices S&P issued to Finvex are listed below:

| **Invoice Number** | **Date** | **Amount ($)** |
|---|---|---:|
| *Custom Order Schedules* | | |
| 60049815 | January 2, 2017 | 138.52 |
| 60059078 | November 1, 2017 | 23,070.27 |
| 60058604 | December 16, 2017 | 45,000.00 |
| 60059551 | January 25, 2018 | 8,500.00 |
| 60060528 | February 6, 2018 | 10,000.00 |
| 60060577 | February 22, 2018 | 4,000.00 |
| 60061261 | March 1, 2018 | 9,000.00 |
| 60062307 | March 1, 2018 | 67,872.97 |
| 60062113 | April 10, 2018 | 27,500.00 |
| 60062044 | April 20, 2018 | 16,500.00 |
| 60062778 | May 4, 2018 | 27,000.00 |
| 60064905 | June 1, 2018 | 44,359.83 |
| 60064908 | June 1, 2018 | 22,633.82 |
| 60063567 | June 26, 2018 | 4,000.00 |
| 60064580 | July 3, 2018 | 14,000.00 |
| 60064465 | July 7, 2018 | 12,000.00 |
| 60067771 | August 30, 2018 | 6,417.70 |
| 60067772 | August 30, 2018 | 42,199.13 |
| 60067294 | November 1, 2018 | 11,000.00 |
| 60068134 | December 16, 2018 | 45,000.00 |
| 60068997 | January 25, 2019 | 8,500.00 |
| 60070012 | February 6, 2019 | 10,000.00 |
| 60070059 | February 22, 2019 | 4,000.00 |
| 60071022 | March 1, 2019 | 9,000.00 |
| 60074382 | July 7, 2019 | 12,000.00 |
| 60074487 | July 3, 2019 | 14,000.00 |
| 60073472 | June 26, 2019 | 4,000.00 |
| 60072592 | May 4, 2019 | 27,000.00 |
| 60071684 | April 20, 2019 | 16,500.00 |
| 60071748 | April 10, 2019 | 27,500.00 |
| 60075723 | June 1, 2019 | 41,871.53 |
| 60075724 | June 1, 2019 | 40,826.66 |
| 60075725 | June 1, 2019 | 6,986.36 |
| 60075726 | June 1, 2019 | 6,976.55 |
| 60077918 | August 1, 2019 | 11,000.00 |
| 60078684 | September 5, 2019 | 45,000.00 |
| | | |
| *Pricing Schedules* | | |
| 60062087 | January 4, 2018 | 52,000.00 |
| 60071772 | January 4, 2019 | 52,000.00 |
| | | |
| ***TOTAL*** | | **829,353.34** |

31. To date, despite S&P's full performance – and S&P's offers that Finvex satisfy these obligations, via installment payments – Finvex has failed and refused to pay these invoices.

32. In addition, in 2019, Finvex failed to report certain details – including notional amount, term to maturity, and issuance date – relating to financial products issued in connection with Finvex's custom indices. Finvex is required to report such details, on a quarterly basis, pursuant to the MCA and related Schedules. These reports are used by S&P to calculate the IP license fee payable by Finvex to S&P. Because, in 2019, Finvex failed to report, S&P was unable to calculate the 2019 license fee and, therefore, was unable to issue the invoice on account of the 2019 license fee. Upon information and belief, based on Finvex's 2018 reports, the license fee Finvex owes S&P for 2019 totals not less than $150,000.00.

33. For all the foregoing reasons, Finvex is liable to S&P for the amounts due under these invoices and the 2019 license fee(s), totaling not less than $979,353.34, together with applicable pre-judgment interest, post-judgment interest, expenses, costs, and attorneys' fees.

**FIRST CAUSE OF ACTION**
**(Breach of Contract)**

34. Plaintiffs repeat and reallege each of their allegations contained in Paragraph 1 through and including Paragraph 33, as if fully set forth at length hereafter.

35. Plaintiffs performed all of their obligations under the MSA, MCA, the Custom Order Schedules, the Pricing Schedules, and related contractual materials. As a result, Defendant received the full fruits of the parties' contracts.

36. Under the MSA, MCA, the Custom Order Schedules, the Pricing Schedules, and related contractual materials, and by virtue of Plaintiffs' full performance, Defendant currently owes Plaintiffs an amount not less than $979,353.34.

37. Despite Plaintiffs' full performance, Defendant materially breached the MSA, MCA, the Custom Order Schedules, the Pricing Schedules, and related contractual materials by, among other possible things, failing to report with respect to financial products issued and linked to the custom indices, failing and refusing to pay Plaintiffs all or any portion of the amount it currently owes Plaintiffs under the MSA, MCA, and related Attachments and Schedules.

38. Plaintiffs have been damaged by Defendant's breaches.

39. By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but not less than $979,353.34, together with pre-judgment interest, post-judgment interest, expenses, costs, and attorneys' fees.

## SECOND CAUSE OF ACTION
### (Unjust Enrichment)

40. Plaintiffs repeat and reallege each of their allegations contained in Paragraph 1 through and including Paragraph 39, as if fully set forth at length hereafter.

41. Plaintiffs performed all of their obligations under the MSA, MCA, the Custom Order Schedules, the Pricing Schedules, and related contractual materials. As a result, Defendant received the full fruits of the parties' contracts.

42. Despite Plaintiffs' full performance, Defendant has failed and refused to pay Plaintiffs all or any portion of the more than $979,353.34 that Defendant currently owes Plaintiffs under the MSA, MCA, the Custom Order Schedules, the Pricing Schedules, and related contractual materials.

43. Plaintiffs have not achieved the benefit of the bargain and, unless Defendant is ordered, in the interests of equity, to pay Plaintiffs an amount to be determined at trial, but not less than $979,353.34, Defendant will have been unjustly enriched at Plaintiffs' expense.

44. By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but not less than $979,353.34, together with pre-judgment interest, post-judgment interest, expenses, costs, and attorneys' fees.

**THIRD CAUSE OF ACTION**
**(Injunctive Relief)**

45. Plaintiffs repeat and reallege each of their allegations contained in Paragraph 1 through and including Paragraph 44, as if fully set forth at length hereafter.

46. Plaintiffs performed all of their obligations under the MSA, MCA, the Custom Order Schedules, the Pricing Schedules, and related contractual materials. As a result, Defendant received the full fruits of the parties' contracts.

47. Despite Plaintiffs' full performance, and despite having been given an opportunity to cure, Defendant has failed and refused to comply with its contractual obligations under the MSA, MCA, the Custom Order Schedules, the Pricing Schedules, and related contractual materials.

48. As a result, effective no later than November 29, 2019, Plaintiffs terminated the MSA, MCA, the Custom Order Schedules, the Pricing Schedules, and related contractual materials.

49. Under the MSA, Finvex agreed that, upon any termination of any Services Attachment by either party, Finvex would: (i) cease all use of the applicable Services provided under that Services Attachment; (ii) expunge the relevant Services and any portion or copies thereof from all of Finvex's electronic systems; and (iii) at SPFS's request, shall certify to SPFS in writing that Finvex has fully complied with that requirement.

50. Under the MCA, Finvex agreed that, upon any termination of the MCA, Finvex would: (i) cease any and all uses of the Custom Indices and Underlying Data; (ii) delete,

remove, or otherwise purge the Custom Indices and all Underlying Data, including any copies thereof, from all of Finvex's electronic distribution systems; and (iii) at SPO's request, certify to SPO in writing that it had done so.

51. Under each of the Custom Order Schedules, Finvex agreed that, upon any termination of each Custom Order Schedule or the rights to use SPO's trade names, trademarks, or service marks: (i) Finvex would cease all use of S&P's trade names, trademarks, or service marks; and (ii) at SPO's request, Finvex would certify to SPO in writing that Finvex had fully complied with that requirement.

52. Upon information and belief, despite termination of the MSA, MCA, and the Custom Index Orders, the Pricing Schedules, and related contractual materials, Finvex continued – and is continuing – to use Plaintiff's indices, underlying data, services, trade names, trademarks, and/or service marks.

53. By reason of the foregoing, Plaintiffs are entitled to injunctive relief in the form of a judgment: (i) enjoining and restraining, preliminarily and permanently, Defendant from (a) using the indices, underlying data, and services Plaintiffs provided to Defendant under the Agreements, and (b) using or referring to Plaintiffs' trade names, trademarks, or service marks; and (ii) directing Defendant (a) to expunge the custom indices, underlying data, and services, together with any portion or copies thereof, from all of Defendant's electronic systems, and (b) to certify, in writing, that Defendant has completed such expungement.

\*\*\*   \*\*\*   \*\*\*

**WHEREFORE**, Plaintiffs Standard & Poor's Financial Services LLC and S&P Opco, LLC respectfully request that the Court enter judgment on the Complaint:

(iv) On Plaintiffs' first cause of action for breach of contract, awarding monetary damages to Plaintiffs and against Defendant in an amount to be determined at trial, but not less than $979,353.34, together with pre-judgment interest, post-judgment interest, attorneys' fees and costs;

(ii) On Plaintiffs' second cause of action for unjust enrichment, awarding money damages to Plaintiffs and against Defendant in an amount to be determined at trial, but not less than $979,353.34, together with pre-judgment interest, post-judgment interest, attorneys' fees and costs;

(iii) On Plaintiffs' third cause of action for injunctive relief, a judgment: (i) enjoining and restraining, preliminarily and permanently, Defendant from (a) using the indices, underlying data, and services Plaintiffs provided to Defendant under the Agreements, and (b) using or referring to Plaintiffs' trade names, trademarks, or service marks; and (ii) directing Defendant (a) to expunge Plaintiffs' indices, underlying data, services, trade names, trademarks, and service marks, together with any portion or copies thereof, from all of Defendant's electronic systems, and (b) to certify, in writing, that Defendant has completed such expungement.

(iv) Awarding such other relief as the Court deems just and proper.

Dated: New York, New York
March 18, 2020

        **MONTAGULAW, P.C.**

        _/s/ Alexandre A. Montagu_
        Alexandre A. Montagu (AM-6989)
        Kenneth E. Aldous, Of Counsel (KA-9526)

        1120 Avenue of the Americas, 4th Floor
        New York, New York 10036
        (212) 996-1287 (tel)
        (212) 996-959 (fax)
        alex@montagulaw.com
        ken@montagulaw.com

        _Attorneys for Plaintiffs Standard & Poor's_
        _Financial Services LLC, and S&P Opco, LLC_